United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY ARAGO,<br><br>           Plaintiff,<br><br>     v.<br><br>MICHAEL J. ASTRUE, *Commissioner,*<br>*Social Security Administration*,<br><br>           Defendant.<br>_____/ | No. C-09-3603 EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**(Docket Nos. 17, 20)** |

In March 2007, Plaintiff Gary Arago filed for disability insurance and Supplemental Security Income ("SSI") benefits. Mr. Arago has exhausted his administrative remedies with respect to his claim of disability. This Court has jurisdiction for judicial review pursuant to 42 U.S.C. § 405(g). Mr. Arago has moved for summary judgment or, in the alternative, a remand for additional proceedings. The Commissioner has cross-moved for summary judgment. Having considered the parties' briefs and accompanying submissions, the Court hereby **DENIES** Mr. Arago's motion for summary judgment and **GRANTS** the Commissioner's motion.

## I.   FACTUAL & PROCEDURAL BACKGROUND

In March 2007, Mr. Arago filed for disability insurance and SSI benefits, alleging disability as of January 1, 2005, due to a heart attack. *See* AR 99-114 (applications). Mr. Arago's applications were initially denied on June 22, 2007, *see* AR 58-61 (notice of disapproved claims), and again on reconsideration on September 28, 2007. *See* AR 64-69 (notice of reconsideration). Mr. Arago then sought an administrative hearing before an administrative law judge ("ALJ"). *See*

AR 71 (request for hearing by ALJ). A hearing was held before an ALJ on March 2, 2009. *See* AR 21 *et seq.* (ALJ hearing transcript).

On March 26, 2009, the ALJ held that Mr. Arago was not disabled under the Social Security Act. The ALJ evaluated Mr. Arago's claim of disability using the five-step sequential evaluation process for disability required under federal regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.

> Step one disqualifies claimants who are engaged in substantial gainful activity from being considered disabled under the regulations. Step two disqualifies those claimants who do not have one or more severe impairments that significantly limit their physical or mental ability to conduct basic work activities. Step three automatically labels as disabled those claimants whose impairment or impairments meet the duration requirement and are listed or equal to those listed in a given appendix. Benefits are awarded at step three if claimants are disabled. Step four disqualifies those remaining claimants whose impairments do not prevent them from doing past relevant work considering the claimant's age, education, and work experience together with the claimant's residual functional capacity ("RFC"), or what the claimant can do despite impairments. Step five disqualifies those claimants whose impairments do not prevent them from doing other work, but at this last step the burden of proof shifts from the claimant to the government. Claimants not disqualified by step five are eligible for benefits.

*Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

At step one, the ALJ found that Mr. Arago had not engaged in substantial gainful activity since January 1, 2005, the alleged onset date. *See* AR 51 (ALJ decision). At step two, the ALJ determined that Mr. Arago suffered from "coronary artery disease post heart attack and stent placement." AR 51. With respect to step three, the ALJ concluded that Mr. Arago did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Mr. Arago had argued that he met the requirements of Section 4.04C (ischemic heart disease), but the ALJ disagreed because there was no evidence that Mr. Arago's heart disease "[r]esult[ed] in 'very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.'" AR 52 (quoting Section 4.04C(2)). As for step four, the ALJ held that Mr. Arago had the physical residual functional capacity ("RFC") to perform light work as defined by the regulations, *see* 20 C.F.R. §§ 404.1567(b), 416.967(b), except that Mr. Arago was able to lift twenty pounds and could sit, stand, and walk in some combination for at least six hours in an eight-hour day. The ALJ stated that this RFC was

supported by (1) an examination performed by Dr. Clark E. Gable, a non-treating physician; (2) the findings of the non-treating, non-examining physicians with the state agency; and (3) the medical records from his treating physicians at San Francisco General Hospital ("SFGH"). *See* AR 52-53 (ALJ decision). Although this RFC prevented Mr. Arago from doing his past relevant work as a pet store manager, *see* AR 54, the ALJ ultimately concluded – at step five – that Mr. Arago was not disabled because, based on his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. *See* AR 55-56.

Thereafter, Mr. Arago sought review of the ALJ decision but his request for review was denied by the Appeals Council on July 16, 2009. *See* AR 1-3 (notice of Appeals Council action). This petition ensued.

## II. DISCUSSION

A court

> may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. A court review[s] the administrative record as a whole to determine whether substantial evidence supports the ALJ's decision. . . . . [W]here the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.

*Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted).

In the instant case, Mr. Arago argues that the ALJ's decision was erroneous for three reasons: (1) because the ALJ incorrectly concluded at step three that Mr. Arago did not meet the requirements of Section 4.04C; (2) because, at step four, the ALJ improperly credited the opinion of Dr. Gable, a nontreating examining physician; and (3) because, at steps four and five, the ALJ improperly concluded that Mr. Arago was able to lift twenty pounds. Each of these contentions is addressed below.

A.   Section 4.04C Requirements

As noted above, at step three, an ALJ must consider whether a claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See Celaya*, 332 F.3d at 1180. In the instant case, Mr.

1   Arago argues that his impairment met the impairment listed in Section 4.04C (ischemic heart
2   disease). Section 4.04C provides as follows:

> 4.04 Ischemic heart disease, with symptoms due to myocardial ischemia, as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment (see 4.00B3 if there is no regimen of prescribed treatment), with one of the following:
>
> . . . .
>
> C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC [*i.e.*, medical consultant], preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:
>
> 1.  Angiographic evidence showing:
>
>     a.  50 percent or more narrowing of a nonbypassed left main coronary artery; or
>
>     b.  70 percent or more narrowing of another nonbypassed coronary artery; or
>
>     c.  50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
>
>     d.  50 percent or more narrowing of at least two nonbypassed coronary arteries; or
>
>     e.  70 percent or more narrowing of a bypass graft vessel; and
>
> 2.  Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 4.04C.

In the instant case, the ALJ found that Mr. Arago did not meet this listing because Section 4.04C "clearly requires not only the stated angiographic evidence of the disease . . . but also that there be clear evidence that the claimant's heart disease results in 'very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.'" AR 52 (ALJ decision). According to the ALJ, there was no evidence to support the latter: "The medical record does not show any very serious limitations and the claimant's own testimony regarding his ADLs

1  [*i.e.*, activities of daily living] and physical capabilities completely belies the argument of his
2  representative." AR 52.

3        The Court finds that the ALJ's conclusion is supported by substantial evidence in the record
4  as a whole. As the ALJ pointed out, the medical record does not suggest any "very serious
5  limitations," as required by Section 4.04C(2). For example, in February 2005, approximately a
6  month after the precipitating incident that led to his hospitalization, Mr. Arago told one of his
7  treating physicians that he had not had any additional pain and that he "continue[d] to be very
8  active." AR 207 (medical record, dated 2/1/2005). Seven months later, medical records reflected
9  that Mr. Arago was experiencing no fatigue and he could "walk for about a mile without any DOE,"
10 AR 209 (medical record, dated 9/23/2005), *i.e.*, dyspnea on exertion, which is "[s]hortness of breath
11 which occurs with effort, often a sign of heart failure or ischemia."
12 http://medical-dictionary.thefreedictionary.com/dyspnea+on+exertion (last visited on 5/11/2010).

13       A year after the precipitating incident, Mr. Arago did complain of fatigue, *see* AR 211
14 (medical record, dated 2/10/2006), but several months later, medical records indicated that the issue
15 of fatigue was resolved. *See* AR 214 (medical record, dated 10/2/2006). Medical records also
16 reflected that Mr. Arago was doing well and could walk for about a mile without any DOE. *See* AR
17 213-14 (medical record, dated 10/2/2006). One of his treating physicians noted that Mr. Arago's
18 coronary artery disease was stable. *See* AR 232 (medical record, dated 10/2/2006).

19       In February 2007, *i.e.*, shortly before he applied for benefits, Mr. Arago reported to a treating
20 doctor that he was chest pain free. *See* AR 230 (medical record, dated 2/20/2007). Medical records
21 from that time also indicated that the coronary artery disease was stable and medically managed.
22 *See* AR 215 (medical record, dated 2/25/2007). In subsequent months, Mr. Arago told treating
23 physicians that he felt "fine" and "good" and denied any signs and symptoms of, *e.g.*, chest pain or
24 other aches and pains. AR 203 (medical record, dated 7/20/2007); AR 245 (medical record, dated
25 10/12/2007). Medical records from October 2007 and May and December 2008 reiterated that Mr.
26 Arago's coronary artery disease was stable, medically managed, and/or asymptomatic. *See* AR 246
27 (medical record, dated 10/23/2007); AR 247 (medical record, dated 5/6/2008); AR 254 (medical
28 record, dated 12/10/2008).

1       Contrary to what Mr. Arago argues, his testimony before the ALJ was largely consistent with
2  the medical records discussed above.  For example, Mr. Arago testified that he generally tries to
3  walk six or eight blocks a day for exercise and even stated, "If it's flat I could walk a mile."  AR 28
4  (ALJ hearing transcript).  In addition, Mr. Arago noted that he was able to help do chores around the
5  house – *e.g.*, cleaning, washing the dishes, grocery shopping, vacuuming.  *See* AR 28-30.  That Mr.
6  Arago also stated that he would take rest periods after walking or doing chores and that he would
7  need to take breaks if he were walking up a hill, *see* AR 30, 31, 34, is not enough to establish "*very*
8  *serious* limitations in the ability to independently initiate, sustain, or complete activities of daily
9  living."  20 C.F.R. Part 404, Subpart P, Appendix 1, Section 4.04C (emphasis added).  Furthermore,
10 any claim that such limitations were very serious is problematic given the positive self-reporting that
11 Mr. Arago made to his treating physicians.  *See Miller v. Astrue*, No. H-07-3230, 2009 U.S. Dist.
12 LEXIS 5745, at *10 (S.D. Tex. Jan. 28, 2009) (noting that, "[t]hough Miller presented evidence that
13 she suffered from fatigue and anginal discomfort, other record evidence tended to show that these
14 symptoms did not result in a marked limitation of physical activity" – *e.g.*, "[a] nuclear cardiology
15 report . . . found that Miller was able to exercise on a treadmill for seven minutes").

16      Because the ALJ's step three finding was supported by substantial evidence – *i.e.*, both the
17 medical records and Mr. Arago's testimony – the Court finds no error here.  *See Hale v. Secretary of*
18 *Health & Hum. Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987) (indicating that "'lack of evidence
19 indicating the existence of all the requirements of [an appendix listing] provides substantial evidence
20 to support the Secretary's finding that the claimant did not meet the Listing'").

21 B.      Opinion of Dr. Gable

22      Mr. Arago argues that, even if the ALJ made no error with respect to step three, the ALJ
23 made an error at steps four and five by relying heavily on the opinion of Dr. Gable, a non-treating
24 examining physician, in determining Mr. Arago's RFC.  Mr. Arago asserts that it was improper for
25 the ALJ to give "substantial weight" to Dr. Gable's opinion, AR 52 (ALJ decision), because (1) Dr.
26 Gable was not a treating physician; (2) Dr. Gable was not a cardiologist; (3) Dr. Gable failed to have
27 Mr. Arago do an exercise tolerance test ("ETT"); and (4) under the Social Security regulations, any
28

consultative examination should have been done by a treating physician. None of these arguments is availing.

That Dr. Gable was only an examining physician, and not a treating physician, is not dispositive. It is true that, "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Furthermore, the Ninth Circuit has emphasized that "to reject the opinion of a treating physician 'in favor of a conflicting opinion of an examining physician[,]' an ALJ . . . must 'make [] findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Valentine v. Commissioner Social Security Administration*, 574 F.3d 685, 692 (9th Cir. 2009); *see also Lester*, 81 F.3d at 830 (noting that "'clear and convincing' reasons are required to reject the treating doctor's ultimate conclusions"). But, as the Commissioner points out, here there is no opinion of a treating physician that is in conflict with Dr. Gable's opinion. In other words, the above burden is not triggered because there is no conflict with a treating physician's opinion. In fact, the medical records, as described above, repeatedly stated that Mr. Arago's coronary artery disease was stable and medically managed.

Similarly, that Dr. Gable was not a cardiologist is not dispositive. The record reflects that Dr. Gable was a M.D., *see* AR 196 (evaluation by Dr. Gable), and therefore an acceptable medical source under the Social Security regulations whose opinion may be relied upon by the Commissioner in determining whether Mr. Arago had a medically determinable impairment. *See* 20 C.F.R. §§ 404.1513(a)(1), 416.913(a)(1) (providing that "[w]e need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s)" and defining "acceptable medical sources" as, *inter alia*, "[l]icensed physicians (medical or osteopathic doctors)"). Although, per the regulations, more weight is generally afforded "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist," *id.* §§ 404.1527(d)(5), 416.927(d)(5), that does not negate the credit that is due to Dr. Gable's opinion, especially where, as here, there is no opinion from a specialist in conflict with that of Dr. Gable.

As for Mr. Arago's contention that Dr. Gable's evaluation was flawed because he failed to have Mr. Arago undergo an ETT (exercise tolerance test), that assertion is without merit. Mr. Arago argues that an ETT is required under the regulations unless it would present a significant risk to the claimant. But Mr. Arago has misconstrued what the regulations require.

Mr. Arago's argument appears to be premised on Section 4.00C(7)(a) of 20 C.F.R. Part 404, Subpart P, Appendix 1, which provides: "Before we purchase an exercise test, an MC [*i.e.*, medical consultant], preferably one with experience in the care of patients with cardiovascular disease, must review the pertinent history, physical examinations, and laboratory tests that we have to determine whether the test would present a significant risk to you or if there is some other medical reason not to purchase the test (see 4.00C8)." 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 4.00C(7)(a). Mr. Arago ignores the preceding statement in Section 4.00(C)(6)(b) which states that "[w]e will not purchase an exercise test *when we can make our determination or decision based on the evidence we already have*." *Id.*, Section 4.00C(6)(b) (emphasis added). In the instant case, Mr. Arago has made no showing that an ETT was necessary. There was insufficient evidence, for instance, in the record for the Commissioner to make a determination or decision about whether the appendix listing was met. Based on the Court's review of the record, the evidence in the possession of the Social Security Administration -- *i.e.*, the medical records from Mr. Arago's treating physicians -- uniformly indicated that Mr. Arago's medical impairment was under control and therefore an ETT was not needed in order to do the step three analysis.

This leaves Mr. Arago's final contention that, under the Social Security regulations, the consultative examination should have been performed by one of his treating physicians rather than a non-treating doctor such as Dr. Gable. Mr. Arago points to 20 C.F.R. §§ 404.1519h and 416.919h which provide as follows:

> When in our judgment your treating source is qualified, equipped, and willing to perform the additional examination or tests for the fee schedule payment, and generally furnishes complete and timely reports, your treating source will be the preferred source to do the purchased examination. Even if only a supplemental test is required, your treating source is ordinarily the preferred source.

20 C.F.R. §§ 404.1519h, 416.919h.

In response, the Commissioner argues that there can be no error here because nothing in the regulations mandates that a consultative examination be performed by a treating physician. Some courts have so held. *See, e.g.*, *Buchanan v. Astrue*, No. 08-3618 SECTION "A" (3), 2009 U.S. Dist. LEXIS 124281, at *29 (E.D. La. Dec. 1, 2009) (finding no error when agency failed to ask for consultative exam from treating physician; noting that consultative examination by treating physician may be preferred option but "[t]erms like 'generally,' 'ordinarily' and 'in our judgment' limit the regulations' reach and provide that such procedures are neither mandatory nor ordered in every single case"); *Prater v. Astrue*, No. 08-177-GWU, 2009 U.S. Dist. LEXIS 73611, at *16 (E.D. Ky. Aug. 19, 2009) (finding no reversible error even though ALJ did not choose treating physician for consultative examination; noting that regulation "does not mandate that the treating source perform the consultative examination" and that regulation gives discretion to ALJ "in deciding whether to utilize the services of the treating physician").

While the Court agrees that nothing about the regulations is mandatory in nature, it is not convinced that a failure to have a treating physician conduct the consultative examination may never be the basis for a reversal or remand. In *Harris v. Astrue*, No. 08-CV-3374 (JG), 2009 U.S. Dist. LEXIS 3757 (E.D.N.Y. Jan. 20, 2009), for example, the court concluded that the ALJ did not adequately develop the record because it did not obtain information about the plaintiff's ability to work from her treating psychiatrist. The court emphasized that the Social Security regulations

> are not agnostic as to the source of the evidence needed to assemble an appropriate record; instead, they direct the SSA to seek the information it requires from the claimant's "own medical sources," and resort to consultative examinations only after "every reasonable effort" to obtain evidence from the claimant's sources has failed. Even when the agency determines that a consult is required, the claimant's "treating source" is the "preferred source" of the consultation.
>
> Thus, to the extent the Commission required the information provided by [a non-treating, examining physician and a non-treating, non-examining physician] to reach a conclusion regarding [the plaintiff's] claim of disability, the regulations required that the ALJ first attempt to obtain this information from [the treating psychiatrist]. There's no doubt that the ALJ's need for a Mental Residual Functional Capacity assessment was great; she explicitly accorded "significant weight" to the one provided by [the non-treating, nonexamining physician]. In fairness to [the plaintiff], and as required by the regulations, she should not have done so without first asking [the

|   |   |
|---|---|
| 1 | treating psychiatrist] to provide one as well.  However, there is no indication that she tried to do so, or determined that [the psychiatrist] was unqualified or unwilling to supply such information. |
| 2 |   |

*Id.* at *11-12.

The instant case, however, is distinguishable from *Harris*. First, unlike the situation in *Harris*, it is not even clear which treating physician Mr. Arago believes should have been asked to do a consultative examination. For the most part, each doctor who treated Mr. Arago at SFGH[1] saw him only a handful of times; thus, these doctors were not any or much better equipped to perform a consultative examination than a nontreating source. While one SFGH physician, Dr. Castro, does appear to have seen Mr. Arago six times,[2] this was over the course of approximately three years. In *Harris*, the plaintiff was also treated over the course of three years but the treatment was provided on a much more frequent and regular basis. *See Harris*, 2009 U.S. Dist. LEXIS 3757, at *3-4 (referring to monthly treatment for at least the period June 2005 to April 2007).

Second, and more important, in *Harris*, the failure to obtain information from the treating psychiatrist was especially problematic because the medical records from the treating psychiatrist indicated that the mental impairment suffered by the plaintiff was not stable or medically managed. For instance, the psychiatrist gave the plaintiff a Global Assessment of Functioning ("GAF") score of 50, indicating a serious impairment to psychological functioning. *See id.* at *3-4. Also, although the psychiatrist discussed improvement in the plaintiff's condition, he noted that she was still having episodes of anxiety and even panic attacks. *See id.* at *4. Finally, on a scale of excellent/good/fair/poor, the psychiatrist rated the plaintiff' mental health and work ability as only fair. *See id.* Thus, the information from the treating physician was likely to have substantive probative value, and its absence was likely prejudicial.

The situation in the instant case is materially different. As discussed above, the medical records for Mr. Arago indicate that his heart condition was stable and medically managed. Nothing

---

[1] Based on the administrative record, it appears that Mr. Arago sought treatment for his heart condition only at SFGH.

[2] *See* AR 209-10 (medical record, dated 9/23/2005); AR 211-12 (medical record, dated 2/10/2006); AR 213-14 (medical record, dated 10/2/2006); AR 215 (medical record, dated 2/25/2007); AR 246 (medical record, dated 10/23/2007); AR 247 (medical record, dated 5/6/2008).

in the medical records suggest that Mr. Arago had any limitations because of his physical impairment. Even the complaint of fatigue articulated by Mr. Arago in February 2006 was deemed resolved in October of the same year. *See* AR 211 (medical record, dated 2/10/2006); AR 214 (medical record, 10/2/2006). Accordingly, even if the ALJ had erred in not having one of Mr. Arago's treating physicians perform the consultative exam, there is no indication that the error was prejudicial. *See Stout v. Commissioner*, 454 F.3d 1050, 1054 (9th Cir. 2006) (acknowledging that "harmless error applies in the Social Security context").

In sum, for the reasons discussed above, the Court rejects Mr. Arago's contention that the ALJ's reliance on the opinion of Dr. Gable was improper.

C.     Ability to Lift Twenty Pounds

Finally, Mr. Arago challenges the ALJ's finding that he was able to lift twenty pounds, which was part of the ALJ's determination that Mr. Arago could perform light work. *See* AR 52 (ALJ decision); *see also* 20 C.F.R. §§ 404.1567(b), 416.967(b) (stating that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds"). Contrary to what Mr. Arago contends, there is substantial evidence to support this finding. Most notably, there is the medical opinion of Dr. Gable, *see* AR 196 (concluding that Mr. Arago "could lift 20 pounds frequently and 40 pounds occasionally"). There was also the medical opinion of another physician (nontreating and nonexamining). *See* AR 199 (concluding that Mr. Arago could occasionally lift 20 pounds and frequently lift 10 pounds). Finally, even Mr. Arago's own testimony at the ALJ hearing supported the finding. At the hearing, the ALJ specifically asked Mr. Arago: "How much weight do you think you can lift?" AR 29 (ALJ hearing). Mr. Arago responded: "Well, I don't think I want to push it but if I had to I could probably lift 20 pounds but I wouldn't want to do more than that and I wouldn't want to do that unless it was some real bad reason to move it." AR 29.

///

///

///

///

11

1   To the extent Mr. Arago argues that the above testimony shows that he was not able to lift 20
2   pounds with any degree of frequency, the Court does not agree.[3]  Just because Mr. Arago would not
3   *want* to lift 20 pounds does not mean that he was unable to do so, including on an occasional basis.
4   The Court acknowledges that, later during the hearing, when his attorney was questioning the
5   vocational expert, Mr. Arago interjected that he could not lift 20 pounds on an occasional basis.  *See*
6   AR 39.  But this assertion is questionable given his earlier testimony, and, in fact, the ALJ
7   specifically found that Mr. Arago's statements regarding his limitations were not completely
8   credible.  *See* AR 53 (ALJ decision).  In his motion, Mr. Arago has made no express challenge to the
9   ALJ's credibility finding.

10  Even if the Court were to view Mr. Arago's motion as containing a challenge to the ALJ's
11  credibility finding, the Court would find no error as to that finding.  *See Vasquez v. Astrue*, 572 F.3d
12  586, 591 (9th Cir. 2009) (stating that "the ALJ can only reject the claimant's testimony about the
13  severity of the symptoms if [the ALJ] gives specific, clear and convincing reasons for the
14  rejection").  As noted above, the medical opinions provided by nontreating physicians indicated that
15  Mr. Arago's claimed limitations regarding lifting were not supported, and Mr. Arago was self-
16  reporting to his treating physicians that he was doing well.
17  ///
18  ///
19  ///
20  ///

---

[3] The Court also notes that the regulations themselves do not contain any requirements about lifting 20 pounds (as opposed to 10 pounds) with any level of frequency.  The regulations simply provide: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).

While the Dictionary of Occupational Titles ("DOT") does make reference to "[e]xerting up to 20 pounds of force occasionally" in defining light work, *see* DOT, Appendix C, Part IV (available at http://www.oalj.dol.gov/libdot.htm (last visited 4/21/2010)), Mr. Arago has cited no authority stating that the DOT is controlling on the definition of light work.  Even if the DOT were controlling, the complete definition of light work is "[e]xerting up to 20 pounds of force occasionally, *and/or* up to 10 pounds of force frequently, *and/or* a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects."  *Id.* (emphasis added).  The use of the disjunctive "or" is significant.

### III. CONCLUSION

For the reasons discussed above, the Court rejects the arguments made by Mr. Arago and therefore **DENIES** his motion for summary judgment and **GRANTS** the Commissioner's cross-motion.

The Clerk of the Court is instructed to enter judgment in accordance with this opinion and close the file in this case.

This order disposes of Docket Nos. 17 and 20.

IT IS SO ORDERED.

Dated: May 13, 2010

_____
EDWARD M. CHEN
United States Magistrate Judge